The rain starts but who knows. We have a very interesting docket this week and the first case is one of those interesting ones but we would ask you to try to adhere to the time limits that are when the yellow light comes on you have two minutes and when the red light comes on please stop talking unless you're answering a question from the court. We have read the briefs and record excerpts. We may not have been into the entire record so we appreciate record citations when those are available. The first case of the morning is number 23-10078 Neese v. Becerra. We hear first from Mr. Peters. Good morning and may it please the court. David Peters on behalf of the United States of America. The district court erred in several respects when it declared unlawful and set aside the 2021 notice. The notice merely explains that the reasoning of the Supreme Court's decision in Bostock applies to section 1557's prohibition of discrimination on the basis of sex. As a threshold matter, plaintiffs lack standing to challenge the notice. Plaintiffs say they fear losing federal funding from some future enforcement action. The plaintiffs haven't shown that their conduct in any way runs afoul of the plaintiffs. So if the plaintiffs had said we are not going to take care of anybody who is transgender, I would not say that but I'm saying if they were to say that that's a quote, would they then have standing? That's a much easier case, Your Honor, because again the notice doesn't specify which conduct is prescribed. Just a high level of generality says Bostock's reasoning applies and they would still need to show some credible threat of enforcement but in a situation like that in which plaintiffs are just saying categorically we don't intend to provide this conduct, then... I mean even if it's something like they want to come in for a COVID vaccine, we're not going to give it to them because they're transgender or they're homosexual or whatever. Some statement like that, that they will simply refuse to care for those people regardless of what the caring is, whether it has a lick to do with what your physical body is. Is that something that then you would not be protesting standing on? You're right. I think we'd still have some questions about whether there would be an enforcement action because plaintiffs haven't shown that the HHS has ever enforced Section 1557 in this way. Why don't you pull the mic up a little closer? Of course. Is that better, Your Honor? Yes. But that would be something to fear because why else have you set out that notice but to let people know don't do that? I think, Your Honor, the notice's clarifying clarity about the application of Bostock but, you know, as this court explained in Braidwood, there is a very thin line between a declaratory judgment and an advisory opinion and the question about whether... Yeah, the vaguer it is, the easier it is for you to challenge standing until you go after someone. I don't think that's right, Your Honor. I don't think the notice clarified much of anything. But that just underscores why there's no standing, Your Honor. Well now wait a minute. Standing, I mean, we're only talking about the first condition of standing, which is injury, right? Yes, Your Honor. We're talking about the... We look at that in terms of the affidavits that each doctor filed and it seemed to me, I wasn't clear on it, but it seemed to me that they people under 16, I do not treat anyone under 16, right? Your Honor, I think... But what if they're between 16 and 18? There's still minors in the eyes of the law. Suppose someone comes in and, you know, asks for puberty blockers or whatever, 16 to 18 years old. Your Honor, I mean, so Dr. Nese's testimony is that she does not treat minors or teenagers. She's just not comfortable with that. It is not in her area of specialty. And HHS has never required a physician to provide care that is outside their area of specialty. I think if you look at, for example, page 34 of the response brief in which the plaintiffs lay out the kind of conduct that they intend to engage in, and there's just no fair reading of the notice that that level of conduct or that specific conduct is prescribed by the statute. Well, just what does the notice include then? Your Honor, it explains that Bostock's reasoning applies to Section 1557. Well, you're talking about medical care. We're not talking about sports where it's an easy question about boys on girls teams and bathrooms and locker rooms. We're talking about medical care. So what they do, but the notice doesn't say it doesn't include those things. But, Your Honor, Section 1557 is also framed at a high level of generality. That doesn't mean that any physician can come into court and have this court confirm that what they want to do is not prescribed. You still have to show a credible threat of enforcement that the conduct that you want to engage in as a physician is prescribed. And plaintiffs haven't shown that. Again, Your Honor, it is perfectly sensible for a physician to prescribe someone getting a prostate exam who has a prostate. It's not discriminatory. It's just reality of people's bodies. So it's not discriminatory even under just general sex to say, well, a woman needs X and a man needs Y in terms of tests because of what they've got in their body. Your Honor, it is perfectly sensible for a physician to prescribe someone getting a prostate exam who has a woman. And it's not discrimination just because that individual happens to be a trans woman in the same way that if an individual who came in and a physician prescribed them a prostate exam, it wouldn't be age discrimination in violation of Section 1557 just because that person happens to be over 40. Can we take these representations on your part to be the authoritative position of HHS? Your Honor, in our brief, we said on this record, HHS does not understand the conduct that they intend to engage in as represented in the declarations to be discriminatory. And so there is not an indication. So these plaintiffs face no risk of future prosecution in the view of HHS pending the notice of proposed rulemaking? On this record, Your Honor, just what they say they want to do, when you look at page 34 of the brief and they say they want to engage in four activities, there's just no indication that that would be a violation. I mean, again. Actually, one of them I think would be banned would be against Texas law, which is converting somebody from one gender to another under age 18. Isn't there a Texas statute that prohibits that? Your Honor, I'm familiar with Texas state law. I'm not positive, Your Honor. But I would say that the conduct that they want, just to answer Judge Jones' question, HHS does not understand the conduct that they are engaging in to be discriminatory. And because of that, there's no showing that they face a credible threat of enforcement. The only injury that plaintiffs are claiming is that they fear some future enforcement action for engaging in conduct that they think the Secretary thinks violates the statute. As we're made clear, we don't think that conduct violates the statute. And there's just no fair reading of the notice that it does. And plaintiff's theory is in some ways tied up with the merits in that their view is that the notice somehow misconstrues Bostock. But that's just an entirely contrived view of what the notice says and what Bostock says. Plaintiffs have this idea that they can discriminate. There are some category of discrimination on the basis of sexual orientation and gender identity on the basis of sex. But Bostock was absolutely crystal clear that discrimination on the basis of sexual orientation and gender identity is necessarily discrimination on the basis of sex. So there's no gap between what the notice says and what Bostock says. And just following up on the question earlier about the doctor's refusal to give certain examinations based on gender at birth, the record doesn't have any indications of refusal of treatment. I think Dr. Neese's concern was more about the patient's refusal to accept treatment. But the reverse is not true in the record, I don't believe. No, Your Honor. Dr. Neese has a patient who has been resistant to care. Dr. Neese has urged that the individual receive that care. There's no way that's discriminatory. That kind of conduct arises all the time if you were insisting on it. So if the patient made a complaint to HHS, this doctor is trying to force a pelvic exam on me and I'm a male, then HHS would respond and say, go fly a kite. I don't know. In so many words, Your Honor, we would investigate. HHS would investigate? Well, if you would investigate it, that means, I mean, if you're going off one affidavit, you're going off this other hypothetical patient's affidavit, you'd have to say if you were biologically a female and the doctor suggested a pelvic exam, then that is not discrimination. Your Honor, that Dr. Neese has, on the facts that we have in the record, that Dr. Neese has gently but firmly insisted that someone get preventative care that is consistent with their sex characteristics is not discrimination. Because I was, well, I appreciate that. Because in the Braidwood case, whichever agency it was, EEOC, was saying that they don't intend to prosecute anyone. And I say prosecute, you know, come after, bring enforcement actions against someone on the basis of religious claims. But they would have to look at everything on a fact-specific basis. And Judge Smith's opinion said that is coy and unconvincing. But you're not being coy and unconvincing. We have a full record here, Your Honor. Braidwood's just a very, the distinction between Braidwood in this case just highlights why there's no standing here. I mean, in Braidwood, the plaintiff there wanted to not hire gay, trans, or bisexual individuals. There was no doubt that that was exactly the kind of conduct that the EEOC guidance prescribed. They sought, I mean, the plaintiffs there had shown that there had been enforcement actions taken against that precise conduct. And none of that showing is present here. But, you know, again, Your Honor, we don't think there is standing. We think there are other threshold defects. But just to reiterate, the plaintiff's merits theory is also deeply flawed. And just to reiterate, plaintiffs also have this idea that somehow the conduct, the notice allows discrimination against bisexuals. And it's just worth pointing out that these plaintiffs aren't saying that they want to discriminate against bisexuals. They aren't, there's no way that they're harmed by any harm. Yeah, so that's back to my original question. That might be, as you say, a closer case. Now let's assume, arguendo, that somebody did say that. And tell me your best argument on the merits, if we did get to the merits, that your notice is acceptable. Yes, Your Honor. Our notice merely says that the language in Title IX, which is incorporated in Section 1557, discriminates on the basis, prohibits discrimination on the basis of sex. That language is indistinguishable from the language in Title VII that's prohibiting discrimination because of sex. This Court and the Supreme Court routinely treat that type of language as imposing the same cognitive causation standard. And so all the notice says is that the reasoning of Bostock, which is that intentional discrimination because of sex, which is prohibited under Title VII, the same reasoning applies under Title IX and by extension 1651. What do you say about this statement? Bostock does not say that men who identify as women are entitled to legal recognition as women. Sorry, if you would repeat it. Bostock does not say that men who identify as women are entitled to legal recognition as women. That would be very material to the Title IX context. I'm not quite sure I follow, Your Honor. Title VII says— Bostock says you may not discriminate in hiring because a man identifies as a woman or vice versa. Of course. Bostock does not say that such a person is treated as a—that a man who identifies as a woman is treated for all purposes as a woman. Take pregnancy. A man who identifies as a woman cannot be pregnant, so therefore the Pregnancy Discrimination Act cannot apply. Do you think Bostock says opposite of that? I think what Bostock says is that when there is a prohibition against intentional discrimination on the basis of sex, that that means that discrimination on the basis of sexual orientation or gender identity necessarily is discrimination on the basis of sex. And just to clarify one more point, Your Honor, it is also true in Title VII that there are exceptions to— amounts to intentional discrimination. And so there may be situations in Title VII or Title IX or Section 57 where there's a question as to whether the conduct actually does amount to intentional discrimination because someone is gay or transgender. But that doesn't answer or defeat the precursor question, which is that where there has been a showing of intentional discrimination on the basis of sexual orientation or gender identity, that necessarily is discrimination on the basis of sex. But again, if Bostock does not say that sexual identity claims are not—does not mean that people are legally entitled to be fully treated as the opposite from their biological sex, then you get into the Title IX question about bathrooms and locker rooms and so on. No, Your Honor. I don't think that's right. Do you have children? I do now, but if I just could answer your question, Your Honor. 1681 is the provision—and I see my time is running out, so if I may just finish. 1681 is the provision that prohibits discrimination on the basis of sex for Title IX. Section 1557 incorporates that. There are any number of ways in which Title IX permits sex separation. There are various exceptions in 1681, in 1686— Well, the government made big arguments against that in the Eleventh Circuit, didn't it? No, Your Honor. And the point is that—and again, I'm running out, so if I may just finish. That's okay. When you're answering the question, it's— Again, I appreciate it. The Adams decision was about how a general prohibition on discrimination on the basis of sex applies in certain contexts in which there has traditionally been sex separation, like bathrooms. And all that the Bostock recognized— Bostock acknowledged that Title VII prohibits discrimination because of sex, and that includes discrimination on the basis of sexual orientation and gender identity. There might be tough questions about how that broad prohibition applies in the context of, say, a bathroom or a dress code. But just because those questions exist doesn't defeat the plain meaning of the statutory language, which makes clear that discrimination on the basis of sexual orientation and gender identity is prohibited sex discrimination. All right. All right. Well, I think we're becoming a little bit repetitive. I would like you to ask one question on when you get up and rebuttal, and that is, think about if you had a baby, a little girl, and your little girl wanted to compete in soccer, and boys were asking to compete and to use the same bathrooms. So, thank you. Thanks, Judge Jones. Okay, Mr. Mitchell. Thank you, Your Honors. May it please the Court. The Biden administration, since the moment it took office, has been misinterpreting the holding of Bostock against Clayton County and insisting that statutes that prohibit sex discrimination— Well, even if that's correct, and I'm not saying it is, your clients are not saying, hey, if a transgender walks in the door, we ain't helping them. They're not saying that, right? They're simply saying if somebody walks in and says, I'm a man, but they have portions in their body that are physically female, they will treat those as physically female. And there's been no indication that the government's going to go after that, which would make not a lick of sense, because whether you say you're female or not, if you have female parts, that's what needs to be addressed. Well, our clients are alleging more than just that, Judge Haynes. That is one of the many ways in which they are concerned of possible enforcement action. We also have statements from Dr. Neese in her declaration, paragraphs 9 and 10 on page 420 of the record, where she says that she is categorically unwilling to assist a minor in gender transition. But she's not a pediatrician. She's not a pediatrician, but she still is willing to treat minors in other circumstances. And she says the reason she will not treat a minor or provide gender transition services to a minor in these situations is because she believes the brains of minors are not sufficiently mature enough. Okay, but isn't there a Texas law against it anyway? There is now. So what difference? So how can you? I mean, and there's a part of the notification that allows for non-discriminatory reasons, for the doctor to refuse treatment for non-discriminatory reasons. Yes, but the notice of her. Why the fact that she doesn't treat minors, and that's outside of her categorical patient services, then why would that fall under this notification? She doesn't say that she doesn't treat minors. What she said is that she will not assist a minor in gender transitioning services. That would not qualify under the notice of proposed rulemaking as a non-discriminatory reason. Also, Judge Douglas, the notice of proposed rulemaking, and this answers Judge Haynes' question as well, the notice specifically says that complying with state laws, such as this recently enacted Texas law that bans gender transitioning for minors, does not qualify as a defense to this. What's the status of the proposed rulemaking? To my knowledge, and I looked at this last night, it is still not a final rule, but my colleague should correct me if I'm wrong, I believe it is still in the proposed rulemaking stage. Would that move this case? No, not at all. I mean, the notice of proposed rulemaking does not provide a safe harbor for the actions that my clients are alleged to take. Well, I understand that, but I suppose that would require a different challenge. Right. It would be a separate agency action. Right. It would have to be challenged in a separate lawsuit. Right. But this agency action that we're challenging is the notification that Secretary Becerra issued. I understand that, and I will, for present purposes, I will accept that there may well be a final agency action. But if they hadn't brought an enforcement during the period in which that notice, that just notice statement was effective, would that be mooted out by the subsequent regulation? No, not in our view. The subsequent regulation, if it becomes final, is not going to repeal Secretary Becerra's notice of May 10th. In fact, it would reaffirm and reinforce the policies that he announced, which is that they are interpreting Bostock in a manner that prohibits all forms of discrimination on account of sexual orientation or gender identity, even though that is not what Bostock held. The holding of Bostock is more limited. Bostock is interpreting a federal statute that bans discrimination on account of sex. And one is only guilty of sex discrimination if changing the biological sex of the person alleging discrimination would change in any way the conduct and behavior of the person accused of discrimination. And if the health care provider would take the same actions with respect to a biological male that it would take with respect to a biological female, there cannot be sex discrimination within the holding of Bostock, even if the health care provider is sometimes discriminating. But these persons are not saying anything different. I mean, that's what I don't understand. And we certainly – and I'm not getting into whether this is – you know, where this stands exactly because there's been a lot of cases on it, but where somebody has a religious reason why they say, I'm sorry, I cannot help you because you're, let's just say, transgender, that's a different animal than your people who are saying, we care for everyone. It's just, as I said, when somebody says, I'm a man, I'm a man, do not give me that. Well, but your body is female. I mean, there's just no getting around that. I don't even understand why they brought this case. What was the point of that? Because they wanted there to be discrimination? No. The reason they brought the case is because Secretary Becerra is threatening them with loss of federal funds. He has called them up and said, I'm going to go after you? No, the notice itself is the threat. How do they feel threatened when they're being so careful? But otherwise, has the Secretary threatened anyone? The notice is the threat. Has he made any direct threats in addition to the notice? Not to my knowledge. That's a step farther than Braidwood, don't you think? I'm not sure it is because Braidwood involved agency action. These were guidance documents.  There had been. You're correct, Your Honor. And then there was what I mentioned to him that Judge Smith said a coy and unpersuasive or whatever was, you know, wishy-washy thing. Well, every case stands on its own, so we can't categorically exempt these. They're saying they're categorically exempting your clients. Yes. So there is one difference between this case and Braidwood that Your Honor points out, which is in the Braidwood case, there had been at least one example of a past enforcement action by the EEOC. Here, we don't have one yet. And partly that's because we challenged this notice shortly after it was issued. I think Secretary Becerra announced the notice on May 10th, 2021. We filed suit shortly thereafter. So there hasn't been as much time for agency action as compared to the EEOC's situation where they had adopted this interpretation almost a decade ago. But I think if somebody was running an emergency room and not allowing somebody who was lesbian to come into the emergency room, I think they would go after that. Of course they would. You would want them to. Well, that's what Bostock means. If you say I'm not going to treat you because you're a lesbian, that is sex discrimination. Because if that person had been a biological man and you kept everything else about the person constant, including their sexual attractions, they would have treated the person. So that is discrimination on account of biological sex. It's prohibited by Bostock. It's prohibited by every federal statute that prohibits discrimination on account of sex. We agree with all of that. What we're saying is the Secretary has gone one step beyond Bostock by saying that it not only bans discrimination based on sex, but it also bans discrimination on account of sexual orientation and gender identity. And that is a step too far. Because it is possible to withhold certain treatments from patients, even if they are patients requested by transgender individuals, without engaging in sex discrimination. Your clients are not withholding any treatment from patients. Their complaint is that the patients are refusing treatment. Those are two totally different things. Dr. Neese is withholding treatments because she will not. To minors? To minors. She will not participate. I'm sorry, Judge Jones. That's okay. Well, discriminating against minors is a different animal than discriminating against men and women. Let's get to the facts here. I agree with Judge Douglas that you make all these arguments about how the patient might insist on this or that. And that's something worthy for you to answer. But it also says she practices internal medicine. She's board certified. And paragraph four of the declaration, general internal medicine for adults. My patients range from 16 to 105. All right, so you're really just talking about 16 to 18-year-olds. That's right. But that shows in the record that she does treat minors. The questions that I've been hearing from Judge Douglas and Judge Haynes have been premised on the idea that she never treats minors. That's not true. No, that's not what I'm saying. Okay, I'm sorry. I misinterpreted your question. I did not say that. I said that she is admitting not discriminating. It's one thing to say minors are a different animal than adults. That is very different from saying men and women are different. There are certainly physical differences, but you should be willing to hire them at your law firm or wherever you are. I didn't check. But you should be willing to hire a man or a woman attorney at your firm if they have good backgrounds and so on and so forth. And you need people, right? Right, but she won't. That's different from if somebody made it through law school at age 16, you might say, well, I think that's a little too young for my law firm. I don't think that you would be sued for that or when. That suit would not be. But Judge Haynes, she won't provide gender transitioning services to minors. So she is discriminating on account of gender identity. Of minors. Of minors, that's correct. She would do it later or maybe she doesn't do it at all because that's not her ability. So if she's not doing it on anyone, then she doesn't have the ability. Exactly. If she's doing it on adults, that is different from minors. And that is adults versus minors. And we have a lot of that in the world. Right. It is adults versus. Back in the day when you could get an abortion in Texas, there was all kinds of rules about minors getting those. Right. Under Texas law. Right. But it doesn't. Remember it well. It doesn't change the fact. Well, if you look at paragraph nine here, she declined to take on a 16-year-old patient, mother longstanding patient of hers who wanted to assist the teenage daughter in getting transition hormones. I did not take on this patient as I was not comfortable taking a teenage transition due to, one, two, that is not my area of specialty. Three, the brains of minors are not fully mature. Yeah, not fully mature. And four, other transgender patients have already transitioned and I maintain their care. So this boils down to three reasons given why she would not assist in gender transition, you know, services. And you're saying that would be enough to violate the notice. It clearly is. Well, now, Mr. Well, all I'd say is we'll let him answer on rebuttal. But Mr. Peters says nothing Dr. Neese does violates the notification. But there's nothing. First, the notification is not what we're challenging. I'm sorry. The notice of proposed rulemaking is not what we're challenging. We're challenging the notification. Yes. And there's no safe harbor anywhere in the notification that says that you can withhold gender transition services for minors based on the reasons Dr. Neese gave or based on any other reason that she might give. Every rule you ever do, somebody could find some kind of exception or something, some question. You can never write a rule that some lawyer can't find something to say about. So I don't know why in this case the fact that they're saying, look, we've looked at what she says she does and we have no problem with it, why that doesn't end the matter. They haven't said that. Why are we here? They haven't said either in the notice of proposed rulemaking or in their briefing or even at oral argument today. There's a part of the notification that says that services can be declined to provide health service to any individual or where the covered entity reasonably determines that such health service is not clinically appropriate for that particular individual. Why doesn't any of that provide a safe harbor? Your Honor, I think if you read on, I don't have the text in front of me right now, I believe it goes on to say that you can never say that gender transition is categorically inappropriate for a patient. I believe that's in the very next clause or perhaps even the next sentence. He's not saying it's categorically inappropriate, just saying this is a little young. So when that kid that's 16 turns 18, which doesn't take that long, that's a different animal. That's right. But the point being that children may change their minds over time. I'm not talking about specifically on gender, but just in life. I mean, I wanted to be a teacher in fourth grade, then decided I wanted to be a lawyer in fifth grade, and I don't know that that's anything wrong with that, and then I became a lawyer. But the point being as a kid, things can change over time, and it is a little bit of a different world, and that's all she's saying. She's not saying never ever should you transition. Right, but she is categorically unwilling to provide the transition services to minors at that time. Why isn't that, though, discriminating against minors, which is not the issue? It is both. It is discrimination against minors, but it's also discrimination on account of gender identity based on this notice that Secretary Becerra issued, because if you are withholding the preferred treatment, at least it's not entirely clear, because all the notice says is that Section 1557 of the Affordable Care Act will be construed to prohibit all forms of discrimination on account of sexual orientation or gender identity. No further elaboration is given. So health care providers just have to wonder if they do not provide requested services from their transgender patients, will the Secretary deem that a violation of 1557? What is the best case for standing that you can cite? 303 Creative is the best, I believe, because that allowed a pre-enforcement challenge before the person even entered the market. The analogy here would be a doctor who just graduated from medical school and hasn't even opened their practice yet, and you're allowed in those situations to bring a pre-enforcement suit to clarify what you can and can't do in your business and in your practice, and that's why we're bringing suit right now, because this notice is vague. It's not clear what the Secretary will deem permissible or impermissible. I mean, this is a real interesting proposition, because any businessman would say that half the regulations that come out of Washington are not clear enough to know precisely what follows the law, Fair Labor Standards Act being one of the premier ones. So does that mean they can all file pre-enforcement challenges? This is why we have the Declaratory Judgment Act, yes. I mean, you can sue if you have a— Are you—I mean, I was just looking at a whole woman's health this morning, and Justice Thomas thought the plaintiffs there lacked standing. He was outvoted, though, on that issue. He was outvoted. And the reason he was outvoted is because the majority held, and the plurality Gorsuch opinion says, that the regulations at issue in that case could be construed in a way that empowered state medical licensing officials to go after the plaintiffs, and that was enough. The test, Judge Jones, is whether there's a credible threat of enforcement. That's the question the Court has to answer in all of these pre-enforcement challenges. Is there a credible threat of enforcement? If the authorities have explicitly disavowed any intent to go after the plaintiff based on the conduct alleged, that usually will defeat standing. That is not the situation here. There is no safe harbor in Secretary Becerra's notice, and there is no safe harbor in the notice of proposed rulemaking that would immunize health care providers who categorically refuse to provide gender transitioning services to minors. There is some language in the notice of proposed rulemaking suggesting that they can get out of doing this in certain situations, if they say it's not my area of expertise, if they have other reasons for not treating a minor that might not touch on issues of gender identity or sexual orientation. But there cannot be any doctor in America who can safely rely on that representation in the notice of proposed rulemaking without fearing the possibility that they could lose federal funds. And that's all we need to get into the courtroom door under Article III. A credible threat, we have shown that. Wouldn't you agree that if your plaintiff were a surgeon, you wouldn't have standing? It depends what the surgeon would say about his practice, but if he is willing to treat transgender patients and perform surgeries on them on the same terms as other people. Well, and I'm not talking about transgender surgeries. Okay. I'm talking about hormones or something like that. You're describing a—you're saying every doctor in America is at risk, and that's not quite accurate. Well, it just depends how that doctor is going to treat a transgender patient who walks through the door. Will they have to indulge every representation the transgender patient makes about their gender identity? Will they have to go along? Judge Douglas said, but I personally think that's a red herring because that turns standing on a third party's action. I don't think it—well, it doesn't turn on a third party's action. This is all about what Secretary Becerra said in the notice. And every doctor—it's not hyperbole—I'm sorry. Go ahead. I was just going to say, Your Honor, in response to your earlier question, it's not hyperbolic to suggest that every doctor is at risk here because what if they don't address the transgender patient by their preferred pronouns? Will that be considered a discriminatory act under the notice? We don't know. That wasn't clarified at all in the notice of proposed rulemaking. What if they insist that a biological male patient have prostate cancer screening, even if the person identifies as a female and denies that the person has a prostate? Well, again, that wouldn't be actionable unless—I mean, I guess all of these actions would start with some patient complaining to HHS. That's probably what would happen. HHS may be able to find out about it through some other way, like reading the declarations in this lawsuit. But right now, each of our clients is laboring under uncertainty. They do not know how HHS will ultimately interpret this notification of Secretary Becerra. Wouldn't it be easier to bring this challenge when a rule is promulgated? I don't know if it would be easier or not, Judge Jones. It's all going to depend on what the rule says. And in the meantime, it's clear from Secretary Becerra's notice that this is how Section 1557 of the Affordable Care Act will be enforced. They are interpreting it— Well, but it ain't enforcing it, as you say. I mean, they haven't gone after anyone, and your clients seem like the least likely people for them to go after because they are so graciously trying to be sure. They're saying, we're doing this and this, but the problem is the person's body and so on and so forth. That does not sound like someone who is just throwing all people of one group out the window. Yeah, our clients' views on transgenderism are nuanced. They are not people who would categorically refuse to treat a transgender patient. They want to treat transgender patients in a manner that is ethical. It's a Hippocratic oath. It is, consistent with their obligation to do no harm. And there are reasonable and real disagreements in this context between Secretary Becerra's understanding of a medical provider's obligation and my client's understanding of what those obligations are. And one of them is that minors should not be transitioned under any circumstance. Dr. Nese makes that clear in her declaration. Secretary Becerra has not, either in his notification of May 10th or in the subsequent notice of proposed rulemaking, provided any assurance to medical professionals who will not assist in a gender transition of a minor that they are safe under his interpretation of 1557. I have one other question, and that is you are not defending Judge Kaczmarek's reading of Title VII and 1557, I take it. We didn't make that argument below. And, in fact, we explicitly conceded that there was no real distinction between on the basis of sex in Title IX and because of sex in Title VII. I don't think it's necessarily wrong for a judge to sua sponte, pick up an argument that a litigant hasn't made. But to answer Your Honor's question, we did not make that argument below, and we're not really making it on appeal. Okay. All right. Thank you. Thank you, Your Honors. Mr. Peters. Judge Jones, I intend to answer your question, but just, if I may start, these plaintiffs aren't laboring under any uncertainty. Because, as we said in our first paragraph of our reply brief, based on the record in this case, plaintiffs do not discriminate on the basis of sexual orientation, and their intent in conduct does not constitute gender identity discrimination under any reasonable reading of the challenge notice. So is it your position that this thing about not transitioning someone who's under 18 is a minor issue? Your Honor, it's – Not a little minor, but – I understand. – minor versus adult. Your Honor – Adult versus adult issue. Our understanding of why that's not discriminatory conduct is because it's not what Dr. Neese does. It's not her area of specialty. She says expressly in her declaration that that is not something that she does, that she is comfortable with. It is not something that she – Well, I think a lot turns on this paragraph 9, which is why I recited it to Mr. Mitchell. And she also said, not comfortable taking it on, A, due to the complexity of the issue, medical and emotional issues. After all, you're blocking hormones, you're preventing the natural development, you're causing girls to have mustaches or boys to not develop themselves. Two, that is not my area of specialty. But she said – and three, the brains are not fully mature. Now, it doesn't have – you know, she says I cannot and will not do it. Your Honor, she just – Dr. Neese then is in like – is then similarly situated to many physicians who don't provide these services. And as the – But you're saying that the activity that what she describes in paragraph 9 categorically does not violate the notification. Your Honor, on this record, her statement, this is not my area of specialty, and there's no indication that she's providing like services to cisgender individuals. You're not answering my question. Your Honor, I just – You're reinterpreting the paragraph. And I'm just saying taking the paragraph as it is, you're saying there's no basis for enforcement. Your Honor, the Secretary has been clear that given Dr. Neese's testimony here in the declaration, in her interrogatory, at her deposition, that it does not understand – Categorically unwilling to assist a 16- to 18-year-old to transition. That's not what she says, Your Honor. She says that she's unwilling to – she doesn't provide transition services to teenagers. But then she's no different than someone like a podiatrist, right? A podiatrist might not – might be categorically unwilling to provide transition services, but it's not discriminatory because a podiatrist doesn't provide those services. And so there's no discrimination there because there's legitimate non-discriminatory reason for that person not to provide that service. Why isn't discriminating on basis of being a minor different from gender? It's not a prescribed basis of discrimination under Section 1556, Your Honor. Right. So it's okay. Of course. I mean the point is, as I said – well, I mean, for example, here in New Orleans, if some kid shows up at the bar and they want wine, they ain't going to get it. Well, that's because they're minors and actually under 21. And if you were 22 and walked in and wanted some wine, well, heck, you could get it. That is totally different from a bar saying we will not give wine to a transgender. That's just a different – as I said, a different animal, a different part of the world. Certainly, Your Honor. And I would just – a few more quick points. Plaintiff's site 303 Creative, that case is entirely different. I mean there, the plaintiff – there was no dispute that what the plaintiff was going to do was going to violate the statute, and there had been past enforcement actions. Though, as Judge Haynes pointed out, there has never been a past enforcement action in the context of Section 1557. If the plaintiff is willing to swear that they are going to violate what appears to be the context of the notification, then why don't you – you're not taking that at face value? You're right. It's a summary judgment, right? Sure, Your Honor, but there's nothing in the record to indicate that any of these plaintiffs are going to engage in conduct that violates the statute. Well, that's the basis for standing. That's why you're injured, because you're going to undertake conduct that will likely violate the – that will likely bring you in the crosshairs of enforcement. And if plaintiffs were going to engage in conduct that was on any fair reading of the notice – Basically, you're saying that you're asking us to make a fact determination about their motivations and their activities. No, Your Honor. We're saying that on this record, there's no indication that there's a substantial risk that these plaintiffs are going to face a threat of enforcement, because there's no indication that the conduct they want to engage in is violative of the notice of interpretation. So, the category – the unwillingness – the unwillingness – she says it. Her reasons are not material. She's an MD. She's saying, I will not give those puberty blockers to 16- to 18-year-olds does not violate the notification. No, Your Honor. What Dr. Nese is saying is, I will not provide services that are outside my area of specialty. And nothing in Section 1557 has ever been enforced to require a physician to provide services outside their area of specialty. That's just – my time is up. But that's just a straightforward – Put yourself in the place of a dad quickly and tell me what you think about subjecting your little girl to bathrooms and boys and lock rooms. Your Honor, the notice of interpretation says nothing about bathrooms and boys. No, no, no, no, no. I'm just asking you as a person. Your Honor, the question before the Court is the scope of the notice. The notice – No, sir. I'm entitled. I'm up here. You're down there. I'm just asking you the question. Your Honor, I'm not sure how to answer it other than to say that the question about how Section 1681's prohibition on sex discrimination applies in the context of something like a bathroom or athletics facility – No, no, no, no, no. It is a question that might present difficulties, and that is why the Department of Education is issuing – Well, at least you admit that it presents difficulties. And that's why the Department of Education is – That's the problem with all of this. It's one thing to sit in Washington and make categorical decisions about things. But when you're talking about putting little girls – I have three granddaughters – in situations where they're going to run around half-dressed with half-dressed little boys, and when you're talking about giving them puberty blockers so they can't mature or boys can't mature, it's just – that's the difference between being some kind of 25-year-old in Washington and actually being a parent who has to think about the best way to bring up your child. But that's my view. We ask the district court – I agree with it someday. We ask the district court's judgment be reversed. All right. Thank you.